# United States Court of Appeals
## For the First Circuit

Nos. 04-2568, 04-2569, 04-2570

PEDRO BISBAL-RAMOS,

Plaintiff-Appellant/Cross-Appellee,

v.

CITY OF MAYAGÜEZ; ROBERTO PÉREZ-COLÓN,

Defendants-Appellees/Cross-Appellants,

MUNICIPAL ASSEMBLY OF MAYAGÜEZ,

Defendant, Appellee,

JOSÉ GUILLERMO RODRÍGUEZ,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Circuit Judge,

John R. Gibson, Senior Circuit Judge[*]

and Lipez, Circuit Judge.

Israel Roldán-González, for plaintiff-appellant and cross-

---

[*]Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

appellee.

   Tessie Leal-Garabís, Quiñones Sánchez & Guzmán, PSC, with whom Pablo Hymovitz-Cardona, was on brief, for Roberto Pérez-Colón, appellee/cross-appellant.

   Juan Rafael González-Muñoz, González Muñoz & Vicéns Sánchez, with whom Vanesa Vicéns Sánchez, was on brief, for defendants-appellees and cross-appellants City of Mayagüez and Roberto Pérez-Colón in his official capacity.

_____

October 11, 2006

_____

**JOHN R. GIBSON, <u>Circuit Judge</u>.** Pedro Bisbal-Ramos appeals from the district court's reduction of the compensatory and punitive damages awarded him by a jury in his suit against the City of Mayagüez, Puerto Rico, and Roberto Pérez-Colón, the President of the Mayagüez Municipal Assembly, alleging harassment and termination of employment in violation of his First Amendment rights. Bisbal also contends that the district judge who reduced the damages should not have done so because he was not the same judge who presided at trial. The City[1] cross-appeals, arguing that there was no evidence to support the jury's finding that any workplace harassment was politically motivated or that it resulted from a City policy or custom. Pérez also cross-appeals, arguing that the evidence at trial did not support any award of punitive damages and that he was entitled to qualified immunity. We affirm the district court's denial of judgment as a matter of law, but remand for the district court to determine whether to enter a remittitur.

Bisbal is a member of the Popular Democratic Party, or PDP, and is apparently a fairly prominent and well-connected one. His brother was a municipal assemblyman from 1993 up through the

---

[1]Pérez was also named in his official capacity, and in his official capacity, he joined the City's cross-appeal. Because a claim against Pérez in his official capacity is essentially a claim against the City, <u>Gomez</u> v. <u>Rivera Rodríguez</u>, 344 F.3d 103, 120 n. 12 (1st Cir. 2003), we will name only the City in discussing the cross-appeal.

time of the trial in this case.  At trial, Pérez, another PDP member and the President of the Mayagüez Municipal Assembly, was able to recount which candidates Bisbal had supported in numerous elections going back to 1992.

Bisbal met Pérez at a political event in 1992.  Bisbal went to work for the City of Mayagüez in 1993 in the municipal housing department.  His position was a "transitory" one, but his one-year contract was renewed through 1995.  In August 1995, Pérez, who was the nominating authority for the Assembly, nominated Bisbal to work for the Municipal Assembly as "office administrator."  Up to that time, the job had been performed by another person, María Eugenia Soto Nieto, a permanent employee, but Bisbal joined her. Bisbal's duties included ordering supplies, working on accounting and budgeting, drafting ordinances and resolutions, recording assembly proceedings, serving the assembly members coffee, and delivering notices of the meetings.  He earned a salary of $1725 per month, which eventually was raised to $1785.  Bisbal's first two employment contracts with the Assembly were for a year each, and his third contract was for six months.  At the end of 1997, he received a notice that his appointment would terminate at the end of 1997, but nevertheless, he received a six-month renewal at the beginning of 1998. Beginning in 1999, his renewals came in three-month or one-month increments.  Bisbal stated that the change to shorter appointments in 1999 was part of a pattern in which

"basically, they just started to withdraw their trust on me and to sort of move me out of the way and sort of leave me out on the fringes of the Municipal Assembly."

Bisbal testified that the reason his job changed in 1999 was that the others in the Assembly office became caught up in a campaign for the November 14, 1999 PDP primary. Bisbal testified that the Mayagüez Municipal Assembly virtually became the campaign headquarters for Charlie Hernández, a candidate for Representative, and that all those working for the Assembly quit doing their official duties and devoted themselves to campaign activities. All, that is, except Bisbal, who supported Ferdinand Lugo, Hernández's rival. Bisbal was the lone Lugo supporter in the office. Bisbal testified that in this environment, he had nothing to do at work except some "small routine things." He felt "completely cast aside." Significantly, Pérez supported Hernández.

Two weeks after the primary, on November 29, 1999, Bisbal received notice that his contract would not be renewed after December 31, 1999. Pérez made the decision not to renew the contract and he signed the notice of termination. Pérez testified that Bisbal was the only employee at the Municipal Assembly whom Pérez knew to be supporting Lugo, and Bisbal was the only employee who lost his job at this time. Bisbal testified that he "made a large number of efforts to go in and talk to [Pérez]," but he was never allowed in to see him. The City had budgeted for Bisbal's

-5-

position through June 30, 2000. Pérez testified, "From 1995 to 1999 I made a lot of movement to get [Bisbal] another position in the Municipal Government of Mayagüez. After the termination of his contract in '99 I didn't make anymore."

Bisbal sued the City, its mayor, and Pérez in his official and individual capacities, alleging violation of his First Amendment rights under 42 U.S.C. § 1983. Specifically, he alleged that he had been harassed in the workplace and that his employment had been terminated because of his political allegiance to Dr. Miguel Rodríguez, the opponent of the mayor in the primary.[2]

The defendants moved for summary judgment. The Honorable Juan M. Pérez-Giménez held that there were issues of fact precluding judgment in favor of the City and Pérez, but that Bisbal had produced no evidence that the Mayor was involved in any way with the alleged harassment or termination of employment; accordingly, Judge Pérez-Giménez dismissed the claim against the Mayor.

The case against the City and Pérez was tried to a jury before the Honorable Robert J. Ward. The jury returned a verdict against the City and Pérez on both the harassment and termination claims; it awarded compensatory damages of $60,690 for non-renewal

---

[2]At trial, Bisbal did not discuss his support of the Mayor's opponent, but only the Lugo-Hernández race for Representative. There was no objection, so we consider the complaint amended under Fed. R. Civ. P. 15(b).

of the employment contract and $250,000 for harassment. It further awarded punitive damages of $300,000 against Pérez in his individual capacity.[3]

The defendants moved for judgment as a matter of law, or in the alternative, for remittitur or partial new trial, but attacked only the $250,000 harassment award and the punitive damages, not the $60,690 award based on termination of employment. Before he could rule on the motion, Judge Ward died. Judge Pérez-Giménez ruled the motion in Judge Ward's stead. Judge Pérez-Giménez denied the motion for judgment as a matter of law and the motion for new trial, holding that there was sufficient evidence of political persecution and harassment and of deliberate indifference to Bisbal's constitutional rights. However, he reduced the harassment compensatory damages award from $250,000 to $50,000 and the punitive damages from $300,000 to $5,000.

Bisbal did not object in the district court to the reduction of the damages, but instead immediately took this appeal, contending that the district court erred in reducing the damage awards. The City cross-appealed, arguing that there was not sufficient evidence to establish that the motivation for depriving Bisbal of his duties in November 1999 was political retaliation or

---

[3]Because punitive damages are not available against the municipality, Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981), the punitive damages were awarded only against Pérez in his individual capacity.

that the deprivation was the result of a City policy or custom. Pérez also cross-appealed, arguing that there was not sufficient evidence to support the award of punitive damages against him. The defendants do not appeal the verdict against them for termination of Bisbal's employment.

We will take up the cross-appeals first, because the cross-appeals go to the propriety of any award, whereas Bisbal's appeal concerns the size of award. If the defendants win their cross-appeals, there will be no need to consider Bisbal's appeal.

I.

The City contends that the district court erred in denying its motion for judgment as a matter of law since there was no evidence of political harassment of Bisbal in the workplace in November 1999 and no evidence to establish municipal liability for harassment. We review de novo the district court's denial of a motion for judgment as a matter of law. Borges Colón v. Román-Abreu, 438 F.3d 1, 14 (1st Cir. 2006). In assessing the sufficiency of the evidence to support a jury verdict, we ask whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found in favor of the party that prevailed. Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 25-26 (1st Cir. 2004).

A.

In order to show that he suffered cognizable political

harassment by a government employer, Bisbal had to prove by clear and convincing evidence that he was subjected to an unreasonably inferior work environment. Ortíz García v. Toledo Fernández, 405 F.3d 21, 23 (1st Cir. 2005). Bisbal must further show by a preponderance of the evidence that his political affiliation was a substantial factor in causing the environment to become inferior. Id. The City could still avoid liability by proving that it would have acted the same way regardless of Bisbal's political affiliation. Id.

The standard in this Circuit for the degree of mistreatment that is cognizable in a political discrimination case was set by Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217-20 (1st Cir. 1989) (en banc), which held that an employee must prove by clear and convincing evidence that his or her job had been rendered "unreasonably inferior" to the norm for that position and that the change was of a magnitude that would cause "reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party." Shortly after Agosto-de-Feliciano was decided, the Supreme Court decided Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), which suggested in a footnote that even trivial acts of political discrimination by a government employer would give rise to a constitutional claim. Id. at 76 n.8. Although we have adverted to uncertainty in how these two standards fit together, we have continued to apply the

Agosto-de-Feliciano standard.  Otero v. Commonwealth of Puerto Rico Indus. Com'n, 441 F.3d 18, 21-22 & n.4 (1st Cir. 2006); Rosario-Urdaz v. Velazco, 433 F.3d 174, 178 n.3 (1st Cir. 2006); see Acosta-Orozco v. Rodríguez-de-Rivera, 132 F.3d 97, 101 n.5 (1st Cir. 1997).

Bisbal's evidence is that, whereas he was busy at work before the primary, once the primary campaign started, he had nothing to do at work: "Before that, I always had a lot of work to do, and once the primary started, I was completely cast aside." After the start of the primary campaign, his work day consisted of sitting at his desk, punching his time card in, punching out and doing "some small routine things."

The City does not dispute that depriving an employee of all or almost all his work for an indefinite period can be sufficient to establish an "unreasonably inferior" work environment.  See Rosario-Urdaz, 433 F.3d at 179 ("utterly depriving an employee of work indefinitely . . . might make out a claim"); González-Piña v. Rodríguez, 407 F.3d 425, 432 (1st Cir. 2005) (holding that such facts were more than a scintilla of evidence, but reserving the question of whether they established unreasonably inferior conditions); Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94-95 (1st Cir. 2004) (denial of benefits and assignments sufficient to show adverse action).  Therefore, we will assume that the evidence established an unreasonably inferior work environment.

-10-

The City contends that Bisbal did not prove that anyone intentionally deprived him of duties; instead, the City contends that the evidence showed that once the primary campaign began, the Municipal Assembly office simply quit doing official work, as all the employees but Bisbal were caught up in the political campaign. Where the plaintiff is prominent in the opposition to the prevailing faction in a highly-charged political atmosphere, and is known to the defendant to be so, a jury can infer from these facts plus timing that adverse action is politically motivated. See Padilla-García v. Guillermo Rodríguez, 212 F.3d 69, 75 (1st Cir. 2000) ("This circumstantial evidence that the appellant was a 'conspicuous target []' could alone create an issue of fact on discriminatory animus."); Rodríguez-Rios v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998) (highly-charged atmosphere, conspicuous target, and reassignment of tasks to members of opponent party); Acevedo-Díaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993). There was evidence that Bisbal was actively supporting Lugo, that he was to some degree prominent, and that Bisbal was the only person in his office that did support Lugo. Counsel for the City conceded at trial that Bisbal "may have been a conspicuous target for discrimination." The Municipal Assembly office definitely had a highly-charged political atmosphere in November 1999. The timing of the deterioration in Bisbal's working conditions coincided with the beginning of the primary campaign. This was sufficient evidence to

allow the jury to determine that Bisbal was deprived of duties to retaliate against his political affiliation.

B.

The City contends that Bisbal did not show that the City or Pérez were responsible for the harassment. Bisbal did not attempt to prove that the harassment was the result of an official policy. Bisbal contends that Pérez acted as policymaker for the City and that Pérez took away his duties in the month leading up to the primary. The City does not dispute that Pérez was a policymaker. However, scrutiny of Bisbal's citations to the record does not reveal any active involvement of Pérez in the harassment. Bisbal's testimony at trial did not identify who was responsible for depriving him of his duties. At first he said, "[T]hey just started to withdraw their trust on me and to sort of move me out of the way and sort of leave me out on the fringes of the Municipal Assembly." Bisbal never said who "they" were. Bisbal later said, "Each and every one of the people who were working there, except for me, were backing up Charlie Hernández's candidacy . . . ." Bisbal did not testify that Pérez witnessed the harassment or that Bisbal informed Pérez of it. Thus, the jury could not find that Pérez actively instigated the harassment during the work day.

Even in the absence of a positive decision by the municipality or its policymakers, a municipality may be liable under § 1983 where a custom or practice is so "well-settled and

-12-

widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997) (quoting Bordanaro v. McCleod, 871 F.2d 1151, 1156 (1st Cir. 1989)). The custom or practice must also be the cause and moving force behind the deprivation of constitutional rights. Id. The testimony indicates that Bisbal was virtually without duties for approximately a month, while the entire assembly office operated as a de facto campaign headquarters. Bisbal testified:

> Mr. Roberto Pérez Colón, who was supporting Mr. Charlie Hernández and all assembly members . . . were all favoring Charlie's candidacy, and the atmosphere that you could breathe at the Municipal Assembly was something quite incredible. It was campaigns for Charlie all the time, phone calls for Charlie, activities for Charlie. Basically, that was all that was going on at the Municipal Assembly in Mayagüez.

The scope, duration, and openness of this transformation of a government office into a partisan campaign headquarters would allow a jury to have found that Pérez, the President of the Municipal Assembly and a conceded policymaker, had to have known what was happening, yet did nothing to stop it, and that this transformation caused Bisbal to be deprived of his duties. We therefore determine that Bisbal made a submissible case of municipal liability for the harassment.

## II.

Pérez in his individual capacity contends that there was insufficient evidence to support an award of punitive damages

against him.  He specifically does not seek review of the amount of punitive damages, since he contends that no damages at all should have been awarded.  The special verdict form did not specify whether the punitive damages were awarded for the termination or for the harassment.

Pérez does not challenge the sufficiency of the evidence to support the compensatory award on either the termination or harassment theory.  The evidence showed that Pérez was directly involved in the termination.  The evidence did not show Pérez' direct involvement in the harassment.

> Under 42 U.S.C. § 1983 . . . [a]bsent participation in the challenged conduct, a supervisor can be held liable only if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation  or acquiescence or gross negligence of the supervisor amounting to deliberate indifference. Deliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights. The affirmative link requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.

Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995) (internal citations, quotation marks and punctuation denoting alterations omitted).  We have already determined that the scope, duration, and openness of the transformation of the Municipal Assembly offices into a campaign headquarters was sufficient to allow a jury to infer knowledge by Pérez of such conditions and failure to correct them, and that this transformation caused the

-14-

violation of Bisbal's rights.

We review de novo the district court's ruling as to the sufficiency of the evidence to support an award of punitive damages. Iacobucci v. Boulter, 193 F.3d 14, 25 (1st Cir. 1999). A jury may be permitted to award punitive damages in a § 1983 action when the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). The requirement of "reckless indifference" means that the defendant must act "'in the face of a perceived risk that its actions will violate federal law.'" Borges Colón v. Román-Abreu, 438 F.3d 1, 22 (1st Cir. 2006) (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999)).

Pérez testified that at the time Bisbal's contract was not renewed he knew that political discrimination was unconstitutional. There was evidence from which the jury could conclude that Pérez made the decision to terminate Bisbal's employment because of Bisbal's political affiliation and that Pérez did so with knowledge that the decision would violate Bisbal's constitutional rights. There was also evidence from which the jury could have found that Pérez condoned the transformation of the Municipal Assembly offices into a campaign headquarters, with reckless indifference to the foreseeable adverse effect on the rights of dissenting employees in the office. The district court

-15-

did not err in concluding that the evidence supported an award of punitive damages.

III.

Pérez contends that he is entitled to qualified immunity. Pérez does not point out what the district court did wrong, and the motion for new trial or judgment as a matter of law does not mention qualified immunity. Bisbal, however, does not contend that the defense was waived. Even if the defense was not waived, it is clearly insubstantial in this case. If indeed the district court denied the qualified immunity defense, we review that denial de novo, taking the facts in the light most favorable to the verdict. Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 84 (1st Cir. 2006); Wilson v. City of Boston, 421 F.3d 45, 53-54 (1st Cir. 2005).

A public officer is not entitled to qualified immunity if he violated a plaintiff's constitutional right and if, at the time of the violation, the right was so clearly established that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

The events in question took place in November and December 1999. It was clearly established by Branti v. Finkel, 445 U.S. 507, 518-19 (1980), that public officers were not allowed to fire employees on the basis of political affiliation if such

-16-

affiliation was not relevant to the employee's job. No one contends that Bisbal's job was one for which political affiliation was a legitimate qualification. It would therefore have been unreasonable for Pérez to believe it was lawful to terminate Bisbal's employment for political reasons.

It was also clear after <u>Rutan</u> v. <u>Republican Party of Illinois</u>, 497 U.S. 62 (1990), and <u>Agosto-de-Feliciano</u> v. <u>Aponte-Roque</u>, 889 F.2d 1209, 1217-20 (1st Cir. 1989) (en banc), that subjecting an employee to unreasonably inferior working conditions on grounds of political affiliation could also violate the First Amendment. Pérez does not dispute that deprivation of an employee's duties for an indefinite time creates an unreasonably inferior work environment. It would therefore have been unreasonable for Pérez to believe that it was lawful to allow the Municipal Assembly office to be transformed into a campaign headquarters, with the attendant consequences for political dissenters within the office. We therefore can conclude that Pérez is not entitled to qualified immunity.

IV.

Bisbal contends that it was error for Judge Pérez-Giménez to rule on the remittitur motion when he was not the judge who presided over the trial. Fed. R. Civ. P. 63 provides, "If a hearing or trial has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying

-17-

familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties." Although the district court file does not reveal a separate certification by Judge Pérez-Giménez of familiarity with the proceedings, he did state in ruling on the new trial and Rule 50 motion that he had reviewed the record in the case. The record further shows that the case was originally before Judge Pérez-Giménez, who in fact ruled on the summary judgment motion. It was transferred for trial to Judge Ward, but after Judge Ward's death, Judge Pérez-Giménez presided over a settlement conference and ruled on the motion for reinstatement. The record does not reveal any objection by Bisbal to Judge Pérez-Giménez ruling on the pending Rule 50 motion, either before or after the ruling. Therefore, we will review the issue only for plain error, see Metropolitan Prop. & Cas. Ins. Co. v. Shan Trac, Inc., 324 F.3d 20, 24 (1st Cir. 2003), and no plain error has been shown.

V.

Bisbal contends that the district court erred in reducing the jury's damages awards. Before we can even state the standard of review for Bisbal's appeal, we must face a procedural anomaly. The district court did not enter a conventional remittitur, which requires giving the plaintiff a choice between accepting a reduced damage award and a new trial. See generally 11 Charles Alan Wright, et al., Federal Practice and Procedure, § 2815 at p. 169

(2d ed. 1995).  Instead, the district court simply reduced the amount of compensatory and punitive damages. Bisbal cites <u>Kennon</u> v. <u>Gilmer</u>, 131 U.S. 22, 29-30 (1889), arguing that reduction of the damages violated his Seventh Amendment rights.

With regard to compensatory damages, an order entering "judgment for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial, cannot be squared with the Seventh Amendment."  <u>Hetzel</u> v. <u>Prince William County, Virginia</u>, 523 U.S. 208, 211 (1998) (per curiam).  We therefore must reverse the district court's reduction of the compensatory damages from $250,000 to $50,000 as legal error.  In <u>Kennon</u> the Supreme Court remanded for the district court to exercise its discretion in the first instance:

> The erroneous judgment of the supreme court of the territory being reversed, the case will stand as if no such judgment had been entered; and that court will be at liberty, in disposing of the motion for a new trial according to its view of the evidence, either to deny or to grant a new trial generally, or to order judgment for a less sum than the amount of the verdict, conditional upon a remittitur by the plaintiff.

131 U.S. at 30.  Accordingly, we will remand for the district court to decide whether to exercise its discretion to enter a remittitur, giving Bisbal the choice of whether to accept the reduced award or to take a new trial.

Whether an award of punitive damages is excessive under the Due Process Clause is a constitutional question that we review

de novo.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003); Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001).  We have in the past held that we may simply ascertain the amount of punitive award that would be appropriate and order the district court to enter judgment in such amount. Rowlett v. Anheuser-Busch,Inc., 832 F.2d 194, 207 (1st Cir. 1987). This is in accord with the practices of several other circuits that have concluded that a court may reduce an excessive award of punitive damages without giving the plaintiff the option of a new trial.  Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 285 F.3d 1146, 1151 (9th Cir. 2002); Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1049-50 (8th Cir. 2002); Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 468 (3d Cir. 1999); Johansen v. Combustion Engineering, Inc., 170 F.3d 1320, 1330-33 (11th Cir. 1999).

In order to evaluate the constitutionality of the award, we must apply the guideposts prescribed in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 580-83 (1996), one of which requires us to compare the amount of punitive damages to the amount of compensatory damages awarded.  Campbell, 538 U.S. at 418; Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 85 (1st Cir. 2006).  Because the amount of compensatory damages that will be awarded is yet unknown, we are not able to conduct the required review of the punitive damages award.  Moreover, since Bisbal may

-20-

opt for a new trial, it would be premature for us to approve a punitive damages award based on the compensatory award from the first trial.  We therefore must remand the punitive damages award as well as the compensatory.

We affirm the district court's denial of the City's motion for judgment as a matter of law and the district court's denial of Pérez's motion for judgment as a matter of law as to punitive damages and qualified immunity.  We remand for the district court to decide whether to order a remittitur offering Bisbal the choice between a new trial and a reduced damages award.

Each party is to bear its own costs.