# United States Court of Appeals
## For the First Circuit

No. 06-1944

JOSÉ A. MUÑIZ-OLIVARI; ANNABELLE DURÁN-LÓPEZ;
CONJUGAL PARTNERSHIP MUÑIZ-DURÁN,

Plaintiffs, Appellees,

v.

STIEFEL LABORATORIES, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., <u>Senior U.S. District Judge</u>]

Before

Lynch, <u>Circuit Judge</u>,
Selya, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

Sheldon H. Nahmod, with whom Arturo Díaz-Angueira, Roberto Feliberti, and Cancio, Nadal, Rivera & Díaz, P.S.C. were on brief, for appellant.
Rubén T. Nigaglioni, with whom Rafael Martínez García and Nigaglioni & Ferraiuoli Law Offices P.S.C. were on brief, for appellees.

August 1, 2007

**LYNCH**, <u>Circuit Judge</u>.  A jury found Stiefel Laboratories, Inc. in breach of a 2001 binding verbal contract that guaranteed José Muñiz-Olivari continued employment if Stiefel were to decide in the future to close its Puerto Rico subsidiary, which Muñiz headed.  Stiefel terminated Muñiz's employment, along with that of all of its other Puerto Rico employees, when it shut down its Puerto Rico operations on January 31, 2003.  Muñiz was not offered another position.

The jury awarded Muñiz damages for back pay, front pay, and benefits of over $600,000.  Relying on the district court's instructions that Puerto Rico law permits the award of damages for pain and suffering in a contract action, the jury also awarded $100,000 each to Muñiz and his wife Annabel Durán-López.

This appeal by Stiefel requires us to resolve several issues.  We hold that the evidence at trial did not compel a jury finding in Stiefel's favor.  We affirm the district court's order denying a new trial based on claimed error in the court's jury instructions.  Thus, we affirm the judgment entered on basic contract damages of $613,080.  However, as to the remaining damages, we hold that the issue of when, if at all, damages for mental anguish and suffering are recoverable under Puerto Rico law in breach of employment contract actions should be certified to the Supreme Court of Puerto Rico.  On the separate issue of whether the pain and suffering damages are excessive (should the Supreme Court

of Puerto Rico find that such damages are recoverable), we affirm the district court's decision not to order a new trial or remittitur on the pain and suffering damages.

I.

This diversity case was tried in the District of Puerto Rico on stipulated facts, live testimony presented by plaintiffs, and deposition excerpts offered by defendant. Because there is an attack on the sufficiency of the verdict, we recite the facts in the light most favorable to the verdict. Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22 (1st Cir. 2006); Heinrich v. Sweet, 308 F.3d 48, 53 (1st Cir. 2002).

Stiefel is a company specializing in both prescription and over-the-counter skin care products. Muñiz began working for Stiefel as the marketing manager for Puerto Rico and the Caribbean in June 1991. He headed up marketing and sales for all Stiefel products in Puerto Rico and the Caribbean. Muñiz was recruited into the job, from his previous high-level position at Johnson & Johnson, by a vice president of Stiefel's international division. Muñiz also worked as the general manager of Stiefel's operations in Puerto Rico.

At the time Muñiz began working for Stiefel, Stiefel's Puerto Rico operations were organized under section 936 of the Internal Revenue Code, which provided incentives to U.S. companies to establish operations in Puerto Rico. The section 936 tax credit

was phased out beginning in 1996, see I.R.C. § 936(j), but apparently the 936 program in Mayagüez, where Stiefel had its Puerto Rico operations, ended several years earlier. As a result, in 1992, Stiefel's Puerto Rico operations were moved into a new subsidiary, Stiefel Laboratories, Puerto Rico Inc, which was itself a part of Stiefel's international division. Stiefel's other Caribbean operations remained within its international division. Muñiz's employment continued virtually unchanged, but his employer became Stiefel P.R. Thereafter, Muñiz was paid by Stiefel P.R., although half of his salary was contributed by Stiefel U.S.[1] because of his work in the Caribbean market.

In late 2000, Stiefel made a series of decisions the effect of which was to move Stiefel P.R.'s operations over the next year or so from Stiefel U.S.'s international division into its domestic division. At that time, Pedro Miret, an assistant vice president of Stiefel's international division and Muñiz's direct supervisor, informed Muñiz that the Puerto Rico market would eventually become part of Stiefel's domestic operations.

In April 2001, the oversight of the Puerto Rico subsidiary's sales was transferred from Stiefel's international division to its domestic division. By contrast, Caribbean sales

---

[1] "Stiefel U.S." refers to the parent company, Stiefel Laboratories, Inc. We use "Stiefel U.S." when necessary to distinguish between Stiefel P.R. and the parent company.

and marketing remained in the international division. Muñiz retained responsibility for all sales and marketing in both Puerto Rico and the Caribbean. As a result, he had two bosses, one for Puerto Rico sales, and another for his Caribbean responsibilities.

The change in the oversight of Puerto Rico sales was part of a larger effort, headed up by Brendan Murphy, to reorganize the U.S. sales operations for Stiefel's branded products. Murphy was the president of Glades Pharmaceutical, an "offshoot" of Stiefel that made generic products. He had been asked by Charles Stiefel, the CEO of Stiefel, to oversee the branded products reorganization.

As part of this reorganization effort, on September 11, 2001 Murphy held a meeting of the district managers within the U.S. sales organization. The purpose of the meeting was to encourage the district managers to play a more executive, rather than supervisory, role within the sales organization. Muñiz was asked to attend the meeting both because he was new to the domestic sales division and because he was viewed as a good example of the new, more independent-thinking management style that Murphy wanted to encourage.

Following the group meeting, Murphy met separately with Muñiz. The lawsuit turns on this later conversation. Muñiz testified that he and Murphy privately discussed the planned reorganization. Murphy reiterated that the Puerto Rico subsidiary would become part of Stiefel's U.S. operations. Murphy said that

Stiefel had not yet decided whether it would maintain the Puerto Rico operation as a separate sales force, or would eliminate the Puerto Rico operation and assign U.S.-based sales people to cover that market (or parts of it).

Murphy then assured Muñiz that no matter which course Stiefel pursued, Muñiz's employment was safe. Murphy told Muñiz that should the Puerto Rico operations be maintained, Muñiz would continue as general manager of the Puerto Rico operations and also would oversee sales in Florida.[2] And should Puerto Rico operations be eliminated, Muñiz would supervise Puerto Rico and Florida sales. Murphy also told Muñiz that even if Puerto Rico operations were closed down, Muñiz would not have to move from Puerto Rico; rather, Muñiz could continue to live in Puerto Rico and could travel back and forth as needed. Murphy told Muñiz that his benefits, including a company car allowance, health insurance, and participation in a stock plan, also would continue unchanged.

On cross-examination, Muñiz was asked whether Murphy had specified whether he would be an employee of Stiefel U.S., of Stiefel P.R., or an employee by contract. Muñiz replied:

> At that time it was understood[,] and he probably mentioned it[,] that I was going to be an employee of Stiefel[,] but he couldn't tell me which way, because he didn't know if the Puerto Rico organization was going to be kept or if it was going to be folded into the

_____

[2]   Muñiz testified that it was Murphy who first raised the possibility of Muñiz's supervising Florida sales.

-6-

          . . . [domestic operation,] so he couldn't be
     that specific.

          But I was going to stay on at Stiefel.

Murphy asked Muñiz not to inform others of this agreement; the

company wanted to keep quiet the fact that it was going to make

major changes that would affect many employees.  As a result, Muñiz

did not put the agreement in writing; had he done so, his secretary

would have learned about the changes that were afoot.

          On April 5, 2002, Muñiz sent an e-mail to Tom Weider, who

headed up Stiefel's U.S. sales.  Weider apparently had requested

Muñiz's thoughts on the Puerto Rico market and Stiefel's operations

there.  Muñiz copied Murphy on the e-mail.  At the end of the

message, Muñiz wrote:

     You mentioned that I could be staying in
     Puerto Rico only as General Manager (scenario
     #1), or split my time between PR and a US
     Region or whatever (scenario #2).

Muñiz then detailed the implications of each scenario for the

Puerto Rico market and operations.

          As Stiefel mulled the fate of its Puerto Rico operations,

Muñiz argued that the company should keep the Puerto Rico

operations open and preserve the jobs of the workers there.  He

eventually lost the battle when Stiefel decided to eliminate its

Puerto Rico operations.  Matt Pattullo, who was vice president of

human resources and risk management for Stiefel U.S., went to

Puerto Rico on January 26 or 27, 2003, and informed Muñiz that

Stiefel had decided to close the Puerto Rico operations effective that Friday, January 31, 2003. Pattullo told Muñiz that the employment of all of the Puerto Rico employees would be terminated.

After several days, Muñiz secured a meeting with Pattullo to discuss his own employment. At that meeting, Muñiz learned that his employment was also being terminated. Muñiz told Pattullo that he had an offer to stay with the company, and that if the position he had been offered was not yet available, he would take any job until the Florida/Puerto Rico supervisor job was established. Pattullo did not respond and seemed uninterested. Muñiz testified: "I don't think I got anywhere when I talked to [Pattullo] about [the job offer]."

After the meeting, Muñiz sent Pattullo a memo, dated January 30, 2003, summarizing their conversation and asking if there was a position with Stiefel available for him. The memo did not mention Muñiz's 2001 conversations with Murphy. On cross-examination, Muñiz stated that he had made a mistake in not mentioning the offer again. In a February 18, 2003 follow-up memo to Pattullo, Muñiz wrote:

> I expressed a willingness to relocate to the States to work in whatever capacity Stiefel thinks I can do. The reason is the unemployment problem[,] especially at my age[,] in Puerto Rico. I was told that I would be supervising Florida, Puerto Rico and pos[s]ibly other States -- is that still the case? Aren't they filling new supervisor positions at the present time?

-8-

On February 24, 2003, Muñiz sent Pattullo another memo, which referenced his February 18 memo:

> I don't know if you've read it[,] but the several point[s] I mention in that letter are of outmost [sic] importance to me. [Es]pecially important is the matter of my continued employment at Stiefel Laboratories. The last I heard from Tom Weider was that there would be a recruitment of 30 new sales territories and five new district supervisors, including a bi-lingual supervisor for Puerto Rico and Florida, w[h]ich had been offered me.
>
> Please get back to me as soon as possible.

Pattullo did not testify at trial. Testimony from his deposition was placed into the record, however. Pattullo was asked whether he had attempted to find out from anyone at Stiefel whether Muñiz had in fact received an offer of continued employment from Murphy. He answered, "No." Pattullo stated that he had not investigated Muñiz's claim "because [Stiefel] didn't have the intention to rehire him because of some previous practices, practices which we discussed."

After reviewing the deposition transcript, Pattullo made the following "correction": "I later recall that I did in fact ask Tom Weider if Jose Muñiz was offered a district sales manager position[,] and Tom said no." Both versions of Pattullo's testimony were read to the jury.

Like Pattullo, Weider did not testify, but portions of his deposition testimony were read to the jury. Weider's

-9-

deposition established that Brendan Murphy was ultimately responsible for the Puerto Rico operations. Weider initially denied that Murphy would have had the authority to offer a position to Muñiz without first clearing it through him (Weider). He later stated, however, that Murphy did in fact have the authority to hire someone without consulting him.

Weider also said that he had never been consulted about Muñiz's claim that Murphy had offered him a position in the reconfigured U.S. sales organization. He stated: "I wasn't consulted because there never was a position in the United States for . . . Muñiz. So, I wouldn't be consulted on something that couldn't happen." Weider then reiterated that he had never had a discussion about Muñiz's claim "because [Stiefel] never had a position for Muñiz in the United States." Weider later "corrected" the deposition, stating that Pattullo had shown him Muñiz's February 2003 letter and had inquired whether any agreement or contract existed, and that he (Weider) had answered, "[A]bsolutely not." Weider then again stated: "We don't have an opportunity . . . for him. So, there never would be a discussion."

Weider testified that he had never discussed with Murphy whether Murphy had in fact offered Muñiz a position. Weider said that it was not worthwhile to call Murphy to ask if there was any truth to Muñiz's allegation because "a position . . . [was] not available."

Upon Muñiz's termination, Stiefel repurchased his stock options and paid him an amount equal to fourteen weeks of salary.

## II.

A.          Sufficiency of the Evidence

Stiefel argues that it was entitled to judgment on the evidence because no reasonable jury could conclude that there was a binding verbal contract.

We review the district court's denial of Stiefel's post-judgment motion for judgment as a matter of law de novo. Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 26 (1st Cir. 2006); Valentín-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006). We review the evidence in the light most favorable to the verdict, and we will reverse "only if a reasonable person could not have reached the conclusion of the jury." Valentín-Almeyda, 447 F.3d at 95-96 (quoting White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000)) (internal quotation marks omitted). The standard is a stringent one, though the party bearing the ultimate burden of proof must have presented more than a "mere scintilla of evidence" in his favor and cannot prevail if the jury's verdict rests on overly speculative or conjectural evidence. Webber v. Int'l Paper Co., 417 F.3d 229, 233 (1st Cir. 2005) (quoting Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 30 (1st Cir. 2004), vacated on other grounds, 126 S. Ct. 1329 (2006)) (internal quotation marks omitted).

A verbal contract is enforceable under Puerto Rico law as long as it provides the essential conditions required for its validity. P.R. Laws Ann. tit. 31, § 3451. These essential conditions include "(1) [t]he consent of the contracting parties[,] (2) [a] definite object which may be the subject of the contract[, and] (3) [t]he cause for the obligation which may be established." Id. § 3391.

Stiefel offers several reasons why the evidence was insufficient as a matter of law to establish the formation of a contract under Puerto Rico law. First, Stiefel argues that there was no agreement on two essential elements of cause, or consideration: compensation and duration of the contract.[3] Second, Stiefel argues that there was insufficient evidence that Stiefel U.S., as opposed to Stiefel P.R., was a party to the contract. Finally, Stiefel argues that there was insufficient evidence that Murphy had the authority to bind Stiefel U.S. to the alleged contract.[4]

---

[3] Stiefel asserts that compensation and duration are elements of cause when an employer contracts for the services of an employee but does not cite any case law to that effect. Our resolution of the case does not require us to decide whether this is a correct statement of Puerto Rico law.

[4] Stiefel also briefly asserts that even if a valid offer were made, the evidence does not establish that Muñiz accepted the offer. The argument is waived, see United States v. Zannino, 895 F.3d 1, 17 (1st Cir. 1990), and would fail in any event.

-12-

A reasonable jury could easily have concluded that there was a valid contract to continue Muñiz's employment should Stiefel close its Puerto Rico operations. A jury also could have concluded, particularly based on Weider's testimony, that the company could not even be bothered to ask Murphy whether he had made Muñiz an offer because even if such an offer had been made and accepted, the company had no intention of honoring the agreement because no position for Muñiz existed in 2003.

Stiefel's argument mistakes the nature of the agreement in dispute. Stiefel tries to characterize the claim as one of an oral contract for employment for the rest of Muñiz's working life. In fact, Muñiz's claim is much narrower. He did not claim that Stiefel was obligated to employ him until age 65, no matter what. Nor did he claim that he could not be terminated for performance-related reasons. Stiefel admits that Muñiz's employment performance was good; the only reason for his job termination was the closing of the Puerto Rico operations he had headed.

The essence of Muñiz's testimony was that he and Murphy had agreed that Muñiz's employment would not be terminated as a result of the then-ongoing reorganization of Stiefel's domestic sales division (of which Stiefel P.R. had become a part). Muñiz understood that whether or not Stiefel P.R. were shut down, an option Stiefel was already considering, he had been promised that he would occupy essentially the same position, comparable to the

one he then occupied, overseeing sales in Puerto Rico and Florida, and that he would receive the normal salary and benefits for someone in his position.

At the time of his conversation with Murphy, Muñiz was already employed, with significant responsibility, at a given salary and benefits level. Murphy was in charge of reorganizing Stiefel's domestic sales division. A reasonable jury could conclude that Murphy told Muñiz that regardless of whether Stiefel's Puerto Rico operations were shut down, Muñiz's job would be secure. Murphy was not offering to hire Muñiz, but rather was guaranteeing that Muñiz's employment would continue regardless of the reorganization. Thus, the purpose of the relevant discussions -- and resulting agreement -- was not Muñiz's compensation or benefits, but his continued employment in the event the Puerto Rico operations were eventually closed.

Stiefel argues that at most there was evidence of Muñiz's unilateral understanding, not of a mutual agreement. The premise of the argument is wrong. There was evidence beyond Muñiz's testimony that after the reorganization he was going to oversee sales in Puerto Rico and Florida. Other Stiefel employees, relying not on statements by Muñiz but on statements by Stiefel officials, confirmed the basic structure of the arrangement Muñiz had been

offered.[5]  There also was testimony that Muñiz participated in the hiring of Florida sales representatives because the understanding was that he would soon be overseeing Florida sales.

While the jury needed not have accepted this testimony,[6] it was not unreasonable for it to do so.  Nor was it unreasonable for the jury to conclude that an agreement to continue Muñiz's employment should the Puerto Rico operations be terminated did not need to repeat the basic terms of his then-ongoing employment. Muñiz stayed at his job and helped with the reorganization, despite the risk to him.  A jury could have found that this was adequate acceptance and consideration, to the extent such was needed.

Stiefel also argues that there was insufficient evidence that Stiefel U.S. was a party to any existing contract or that Murphy had the requisite authority to bind Stiefel U.S.  In light of Weider's deposition testimony that Murphy, an officer of Stiefel U.S., could hire someone without consulting Weider, it is difficult to understand why Stiefel is making these arguments on appeal.

---

[5]   Stiefel's brief allusion that the testimony of these other Stiefel employees should not have been admitted is waived. See Zannino, 895 F.3d at 17.

[6]   Plaintiffs seem to argue that the jury was required to accept their lay testimony because defendants did not produce Murphy.  Not so.  See Quintanta-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 75-76 (1st Cir. 2002) (discussing jurors' prerogative to reject uncontradicted and unimpeached testimony that they find incredible).  By the same token, defendants seem to argue that a contract may never be established by the testimony of one party. Again, not so.

-15-

Moreover, the evidence was that Murphy's portfolio was broader than Puerto Rico, that Stiefel's Puerto Rico operations were being merged into Stiefel U.S.'s domestic division, and that the agreement involved responsibilities in Florida. A reasonable jury could easily have concluded, apart from Weider's admissions, that it was Stiefel U.S. that was a party to the agreement.

B.        The Jury Instructions

Stiefel argues that it is entitled to a new trial because the district court's instructions to the jury improperly placed a burden of proof on the defendant. Over the defendant's objections, the district court gave the following instruction to the jury:

> Defendant's Burden of Production. Defendant is not compelled to introduce any evidence or produce any witnesses. If you believe that Plaintiff has discharged a persuasion by a preponderance of the evidence, <u>then Defendant has to discharge his own in order to be successful</u>.

Our review of whether the instruction contained an error of law is de novo. <u>Goodman</u> v. <u>Bowdoin Coll.</u>, 380 F.3d 33, 47 (1st Cir. 2004); <u>Tatro</u> v. <u>Kervin</u>, 41 F.3d 9, 14 (1st Cir. 1994). We review the charge as a whole, <u>Goodman</u>, 380 F.3d at 47, and our focus is on whether the court's instructions adequately illuminated the pertinent law without unduly confusing matters or misleading the jury, <u>Gifford</u> v. <u>Am. Can. Caribbean Line, Inc.</u>, 276 F.3d 80, 84 (1st Cir. 2002); <u>Levinsky's, Inc.</u> v. <u>Wal-Mart Stores, Inc.</u>, 127 F.3d 122, 135 (1st Cir. 1997). A new trial will be ordered only if

after reviewing the entire record we cannot fairly say that a preserved error was harmless. <u>Goodman</u>, 380 F.3d at 47; <u>Beatty</u> v. <u>Michael Bus. Machs. Corp.</u>, 172 F.3d 117, 121 (1st Cir. 1999).

It is black letter law that in a civil action, at the close of plaintiff's case, "the defendant <u>may</u> introduce evidence . . . . The defendant is not required to introduce any evidence or to call any witnesses." 3 K.F. O'Malley et al., <u>Federal Jury Practice and Instructions</u> § 101.02, at 24 (5th ed. 2000) (emphasis added).[7] Matters of defense may be established either by the cross-examination of the plaintiff's witnesses or by testimony of the defendant's own witnesses. <u>N.Y. Cent. R.R. Co.</u> v. <u>Johnson</u>, 279 U.S. 310, 316 (1929). This is not a case in which the defendant presented an affirmative defense on which it bore the burden of either production or persuasion.

Stiefel's argument that the district court's instruction left the jury with the impression that the defendant bore a burden of proof cannot be based on the first sentence of the instruction,

---

[7] It is basic law that in a contract case, the plaintiff has the burden of proof to show that there was a contract and a breach. Nonetheless, plaintiffs have argued to this court that the instruction given is a standard jury instruction used in the circuit courts. None of the provided citations support the argument, which is flatly wrong. <u>Federal Jury Practice and Instructions</u>, on which plaintiffs rely, merely notes that an instruction that the defendant has a burden is appropriate where there is a counterclaim or affirmative defense by the defendant. <u>See</u> 3 <u>Federal Jury Practice and Instructions</u>, <u>supra</u>, § 104.01, at 135. The other pattern instructions that the plaintiffs cite are inapposite, having to do with definitions of preponderance of the evidence.

which plainly (and correctly) says that the defendant bears no burden of production. To our eyes, however, the next sentence is confused. It would have been better for the court not to have used the language it did. The language did literally say that if plaintiffs "discharged a persuasion," then Stiefel bore a burden of persuasion.

Even so, we think that the jury most likely understood that it was being instructed to consider defendant's efforts to discredit plaintiffs' evidence before it completely decided the case, even if it found plaintiffs' case persuasive. This is not contrary to the legal proposition that Stiefel never bore a burden of production or persuasion. At the beginning of its charge, the district court correctly instructed the jury in very clear terms that the plaintiffs bore the burden of proving all of the elements of their case. In the context of the overall charge, a single maladroit statement did not lead the jury astray. See Gifford, 276 F.3d at 84.

Moreover, we agree with the district court that any potential confusion caused by the instruction did not influence the jury's verdict. The instruction was awkward and unfortunate, but it still cannot be said to have prejudiced Stiefel. See Levinsky's, 127 F.3d at 135. Muñiz's testimony, which Stiefel did little to undercut and nothing to rebut, strongly supported the findings that there was an agreement and that it had been breached.

Stiefel called no live witnesses; it did use deposition excerpts. Weider's deposition was devastating to its case. Stiefel chose a parsimonious trial strategy; it lost the case at trial and cannot win it on appeal.

The result of our rejection of these challenges to the merits is to affirm the jury finding of breach of contract and the award of basic contract damages.[8] We analyze the pain and suffering damages, to which defendant objects, separately.

C.      Availability of Contract Damages for Pain and Suffering Under Puerto Rico Law

The district court resolved an unsettled issue of Puerto Rico law when it instructed the jury, without any qualification, that it could award damages for pain and suffering for breach of an employment contract in an ordinary civil case that involved no

_____

[8] The jury awarded Muñiz damages for past earnings of $169,520, for future earnings/front pay of $423,800, and for benefits of $19,740. The sum of these is $613,060. The district court's judgment, however, awarded front pay of $423,820 and total basic contract damages, excluding pain and suffering, of $613,080. Stiefel cites the lower figure in its brief, but it does not appear to have moved to amend the judgment. We thus affirm the basic contract damages of $613,080.

Stiefel asserts in its brief that the jury award is inconsistent with the evidence because it is based on 7 years of lost employment whereas the evidence was that Muñiz would have worked for 9.5 years before retiring. We ascribe no significance to the fact that the jury awarded Muñiz less in damages than he sought.

-19-

claim of violation of anti-discrimination laws or civil rights laws.[9]

The parties have framed the issue as follows. Ordinarily, under Puerto Rico law, damages for pain and suffering are not recoverable in an action for contract. See, e.g., Mattei Nazario v. Vélez & Asoc., 145 D.P.R. 508, Offic. Trans. at 8 (1998) ("With regard to mental anguish and sufferings, we have repeatedly held that, ordinarily, they do not lie in actions for breach of contract . . . ."); González Mena v. Dannermiller Coffee Co., 48 P.R.R. 590, 598 (1935) ("Any damages for mental suffering suffered by the plaintiff are certainly not recoverable in this action, which is based on a breach of contract."). In some cases, when the defendant in breach of contract has on the same facts also committed a tort and foreseeably and necessarily caused pain and suffering damages, such damages are allowable. Camacho v. Iglesia Catolica, 72 P.R.R. 332, 341 (1951).

Stiefel stresses that there is no claim that it engaged in tortious activity and so argues that no emotional distress damages may be awarded. Stiefel separately argues that Muñiz's wife was not a party to the contract, and so she is not entitled to such damages in any event.

---

[9] Before trial, the district court dismissed state-law claims of age discrimination and for damages resulting therefrom. Muñiz does not appeal that ruling.

The plaintiffs stress that it was foreseeable that the loss of expected employment would indeed cause pain and suffering, particularly given the difficulty of finding a job in Puerto Rico at Muñiz's age. The plaintiffs point out that Muñiz indicated in his letters to Pattullo that he was very concerned about his ability to find other employment in Puerto Rico.

The district court essentially adopted the view that it is foreseeable in most employment termination cases, and in this one, that the employee and his or her spouse will experience emotional distress, and that they will therefore be able to seek damages for pain and suffering. Because the court believed that Stiefel's breach of the contract was tortious and the plaintiffs' resulting emotional distress damages foreseeable, it permitted recovery.

Stiefel's two arguments -- that emotional distress damages are not available at all and that even if they are available to Muñiz, they are not available to his wife -- are questions of local policy, which are best addressed by the Supreme Court of Puerto Rico in the first instance. See VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993) ("Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court . . . ."). The rules of that court permit certification. See P.R. Laws Ann. tit. 32, app. III, Rule 53.1(f). We will remand

-21-

with instructions to the district court to certify the questions of whether emotional suffering damages are available to Muñiz and his wife, unless the parties resolve the matter in the interim.

D.          Excessiveness of Pain and Suffering Damages

Stiefel argues that, even if pain and suffering damages are available, the damages awards for pain and suffering of $100,000 each to Muñiz and his wife are "so high, grossly excessive, inordinate and shocking to the conscience" that the district court was required to give a remittitur.

Our review of the denial of remittitur is for abuse of discretion. Gasperino v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996); McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006). A defendant arguing that an award is excessive faces a demanding standard. An award will not be overturned unless it is grossly excessive or shocking to the conscience. Valentín-Almeyda, 447 F.3d at 103; see also McDonough, 452 F.3d at 22. We give special deference to a district court's view that a particular award is not excessive because that court has greater familiarity with local community standards and observed the witnesses on the stand. Valentín-Almeyda, 447 F.3d at 103. The federal standard for excessiveness applies in diversity cases from Puerto Rico. Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 300 (1st Cir. 1999).

Plaintiffs' case with respect to damages rested on their own testimony.[10] Muñiz testified about his inability to find another job, and about the shock he and his wife had experienced as a result of his termination and the eventual realization that they were going to "lose everything." He was visibly emotional on the stand.

Muñiz's wife gave more expansive testimony. She testified that she had become depressed and preoccupied, and that she had trouble sleeping. Her husband also had become depressed. Muñiz and his wife survived on his pension from Johnson & Johnson (which was only $450 per month), the money Muñiz had received for his stock options, and their savings. They had four children, and at one time all four were in college at the same time. Given their economic straits, Muñiz and his wife were at the point where they believed they needed to sell their family home, which was very distressing.

The defense relies heavily on the fact that the plaintiff did not seek medical help for emotional distress, and had no out-of-pocket expenses. Evidence of having sought medical treatment is not required. See Rodriguez-Torres v. Carribean Forms Mfr., Inc.,

---

[10] Stiefel asserts that Muñiz's wife's testimony about his depression must be disregarded because no medical expert testified at trial. This is not so. See Sanchez v. P.R. Oil Co., 37 F.3d 712, 724 (1st Cir. 1994).

399 F.3d 52, 64 (1st Cir. 2005).  The jury could easily have rejected Stiefel's argument given Muñiz's cash flow worries.

Often we look to comparable cases to determine if a damages award is totally out of line.  There may not be any cases that are strict comparators for the pain and suffering damages awarded here, in an ordinary contract action.  After all, in most jurisdictions in this country, emotional distress damages are not available as an ordinary contract remedy.  See, e.g., B & M Homes, Inc. v. Hogan, 376 So. 2d 667, 671 (Ala. 1979); Sawyer v. Bank of Am., 145 Cal. Rptr. 623, 625 (1978); McClean v. Univ. Club, 327 N.E.2d 174, 180 (Mass. 1951); Boyce v. Greeley Square Hotel Co., 126 N.E 647, 649 (N.Y. 1920).

We look to an imperfectly analogous area: employment discrimination law.  The analogy is imperfect because Congress and various state legislatures have, for policy reasons, allowed pain and suffering damages in cases brought under Title VII, the Age Discrimination in Employment Act, and comparable state laws. Still, the distinction between ordinary employment contract cases and employment cases enforcing important federal or state policies goes more to whether emotional distress damages should be allowable at all, rather than to whether a particular award is excessive.

Under this analogous case law, the pain and suffering damages awarded to Muñiz and his wife are not excessive.  More generous awards have been upheld based on testimony similar to that

-24-

here.  See McDonough, 452 F.3d at 22 (affirming jury award of $300,000, the majority of which was for emotional distress, in Title VII unlawful retaliation case); Koster v. Trans World Airlines, Inc., 181 F.3d 24, 36 (1st Cir. 1999) (reducing emotional distress award in state law age discrimination case from $716,000 to $250,000); see also Rodriguez-Torres, 399 F.3d at 64 (affirming, on plain error review, $250,000 award in employment discrimination case).

                                III.

     That part of the judgment for the plaintiffs for basic contract damages in the sum of $613,080 is affirmed, and the judgment should be amended and entered to reflect that amount, with interest.

     On remand, the district court is instructed to formulate, with the prompt assistance of the parties, the appropriate questions regarding the availability of pain and suffering damages in a contract case involving no separate tort allegations and the availability of such damages to a non-party to the contract, and certify them to the Puerto Rico Supreme Court.  See P.R. Laws Ann. tit. 32, app. III, Rule 53.1(f).  If the Supreme Court of Puerto Rico concludes that pain and suffering damages are available to Muñiz or to Muñiz and his wife, then an additional judgment in the sum of $100,000 or $200,000, respectively, will be entered, with whatever interest is appropriate.  Our intention is that the

plaintiffs be able to collect the judgment we have affirmed on basic contract damages, even while there is certification.

Costs are awarded to plaintiffs.  So ordered.